## Cronin v. Cronin.

(Decided May 2, 1916.)

### Appeal from Campbell Circuit Court.

1. Deeds—Delivery and Acceptance Necessary to Validity of—Evidence.—In transactions between adults delivery and acceptance

are both essential to the validity of a deed, but delivery and acceptance may be shown by circumstantial as well as direct evidence.

2.   Deeds—Fraudulent Purpose in Making—Effect of.—Equity will not decree the re-conveyance of real estate conveyed by the grantor for the purpose of defeating creditors.

OTTO WOLFF and L. F. DISKIN for appellant.

JOHN WILLIAM HEUVER for appellee.

OPINION OF THE COURT BY JUDGE CARROLL.—Reversing.

A good many years ago there was devised to Eliza Cronin for life, with remainder to her four brothers, including the parties to this litigation, Joseph and James Cronin, a town lot and some farm land. In 1905, John Cronin, one of the brothers, died, and in 1908, Eliza Cronin, the life tenant, died. In 1911 this suit was brought by James Cronin against his brothers Frank and Joseph for a sale of the property and a division of the proceeds equally between them.

For an answer to this suit Joseph Cronin set up that on March 8, 1892, James Cronin sold and conveyed to him by deed then duly recorded all of his right, title and interest in the property sought to be divided, and the controversy in this case, which is between Joseph and James Cronin, turns on the validity and effect of this conveyance. If by this conveyance James Cronin divested himself of all title to the property his petition should have been dismissed. The lower court, however, held that the conveyance did not divest him of title, and from this judgment Joseph appeals.

There is no dispute about the fact that on March 8, 1893, James Cronin, for the recited cash consideration of fifteen hundred dollars, sold and by deed conveyed to his brother, Joseph Cronin, all of his right, title and interest in the property in question, and that the deed was duly acknowledged and recorded in the proper office on March 15, 1893.

In a reply James Cronin, after admitting the execution and recording of the deed, averred that it was never delivered by him to Joseph or accepted by Joseph.

Several questions are raised in the case, but we think the opinion may be confined to the question whether the deed was delivered and accepted.

James Cronin, after telling that prior to 1892 he had. conveyed some of his property to his father-in-law, Archie Campbell, with the understanding that it was to be deeded by Campbell to James Cronin's wife, in answer to the question how he came to execute the deed to his brother Joe, said:

"My brother Joe was at my house one night, and he always did complain of me not trusting him, and I said that I wasn't afraid to trust him, and to show him that I wasn't I told him I would execute a deed for my interest in the house and the farm, under the same conditions— that he was to be under no expense, and he was to deliver it to me; he was to make a deed back to me whenever I wanted it—and that deed was never delivered to Joe; he has never seen that deed. I went to Uncle Tom Jones and asked him for to make me out a deed to Joe signing my interest in the house and farm, and I explained to him that my brother Joe was to derive no benefits from it, and that he was to deliver, or, he was to make, execute a deed back to me whenever I wanted it, or if it ever was necessary for me to—being in business—if any thing ever should happen, I was to deliver the deed to Joe. Q. When did you have this conversation with Joseph Cronin? A. I think it was March 8, 1892, or—no, it was some time— it was before that. So I went and had Uncle Tom Jones to make out this deed and it was dated March 8th and re- corded March 15th. Q. Well, now, have you given the whole of that conversation; have you told all of it? A. No; we thought that it would be necessary, if anything ever should happen to me, that there should be money passed, so that Joe could say that he bought this prop- erty and paid for it, and I had a twenty-dollar gold piece, and we passed that twenty-dollar gold piece back and forth to make fifteen hundred dollars. Q. Was there any consideration; did he pay you any actual money for the deed? A. No, sir; not one cent. Q. Was there any other matters transacted on March 8th? A. I thought while I was getting Uncle Tom Jones to make this deed out to Joe—I told him for to make out one from Archie Camp- bell and his wife to my wife, and that deed was dated March 8th, too, and I then went, some time in the near future, I went to Archie Campbell and his wife and told them that there was a deed up at the court house, at Uncle Tom Jones' office, for making—making out a deed to my wife for the place on Washington avenue, and when it

was convenient for him and his wife to go up and acknowledge that deed, to do so, and they went and acknowledged that deed March 28th, 1892. Q. Did you pay them any money for signing that deed A. No, sir; I paid all the fees to Uncle Tom Jones. They never were to one cent of expense, or never derived one cent of benefit from the transaction. Q. Who was present when you told Tom Jones to write that deed? A. There was nobody present. Q. Was or not Joseph Cronin present? A. No, sir. Q. Did or not Joseph Cronin ever have possession of that deed? A. No, sir; he never seen it. Q. Did he or not know that that deed was written? A. I don't know if he knew it, but he knew that I told him that I would have a deed written. I don't think he ever knew—I don't think he ever remembered anything more of it. Q. Who had possession of that deed? A. I had, always. Q. What interest, if any, was Joesph Cronin to take under the deed? A. No interest. That was perfectly understood. It was to be a—— I was to make out that deed and Joe understood it, under the same conditions as I made out the other one—that he wasn't to derive one cent of benefit, nor to be at one cent of expense. Q. Was there or not any intention to deliver the deed to him? A. Well, never, unless me, being contracting, that if anything ever should happen, then I would deliver the deed to him, but with the understanding that he was to deliver it back to me—that he was to derive no benefits from it. Q. Did he ever deliver, or, did you ever, pursuant to that understanding, deliver that deed to him? A. No, sir.''

It further appears in the evidence that before this deed was executed James Cronin had become involved in some business troubles in Cincinnati, and that at the time of its execution there were unsatisfied judgments against him. His evidence that we have quoted, as well as other facts testified to by him, make it perfectly plain that his intention in making this deed to his brother Joseph was to put the property out of the way of his creditors. Evidently he was apprehensive that his then existing creditors, or other persons to whom he might become indebted, might attempt to subject his interest in the property, and his purpose was to fix it so that it could not be subjected to the payment of any debts he then owed or might thereafter create.

The evidence further shows that the interest of James Cronin in this property at the time the deed was made

was no., worth over three or four hundred dollars, if that much; and Joseph Cronin testifies that at this time his brother was indebted to him in about this sum or perhaps more, and that subsequent to the execution of the deed became further indebted to him. He further testifies that he expended considerable money in the improvement of this property after the execution of this deed.

There is a good deal of confusion in the record as to how much James owed Joseph at the time this deed was made, and as to how much he advanced him afterwards, and as to how much he paid out in improving and taking care of the property. James says that he did not owe Joseph anything at the time the deed was made, that Joseph did not advance him any money afterwards, and he did not owe him anything on account of improvements made or for money spent in caring for the property. The state of the accounts between these people is in such an unsatisfactory condition that it is impossible to get at the true state of affairs with any degree of certainty, but we are inclined to think that James was indebted to Joseph at the time the deed was made and that he became more deeply indebted to him afterwards.

But aside from the state of the accounts between these parties, the evidence of James clearly shows that he intended to pass the title to the property to his brother Joseph, and the fact that the title under this deed remained in Joseph from 1892 until this suit was brought, in 1911, is in itself very convincing evidence that James considered that Joseph was the owner of the property.

In the argument of counsel for James much reliance is placed on the fact that the evidence does not show that Joseph accepted the deed at the time it was made or at any time. It appears that Joseph did not know of the execution of the deed, or its recording until probably three years afterwards. But he testifies unequivocally that in 1894 or '95, it not being material which, the dates being involved in doubt, he did accept the deed and considered himself the owner of the interest of James in the property.

It is of course elementary that in transactions between adults delivery and acceptance are both essential to the validity of a deed, but delivery and acceptance may be shown by circumstantial as well as direct evidence, and all the circumstances in the case point to the fact that James intended to and did deliver the deed to Joseph

and that Joseph accepted it. Cates v. Cates, 152 Ky. 47; Ward v. Rittenhouse Coal Co., 152 Ky. 228; Peoples Bank of Shepherdsville v. Kulmer, 155 Ky. 359.

It is a further very well established principle that equity will not decree the re-conveyance of real estate conveyed by the grantor for the purpose of defeating creditors. Shamo v. Benjamin's Admr., 155 Ky. 373; Coleman v. Coleman, 147 Ky. 383; Carson v. Beliles, 121 Ky. 294.

We are thoroughly convinced from a consideration of the record that the claim of James to the restoration of this property should be denied.

Wherefore, the judgment is reversed with direction to dismiss the petition.